Gonzalez, G-O-N-Z-A-L-E-Z, for the appellant, D'Entrelle-White. Good morning, Your Honors. Brett O'Connell, O-C-O-N-N-E-L-L, and I represent the people of the state of Illinois. Great. You each have 20 minutes. You don't have to use it. Do you want to reserve any of yours? Yeah, maybe five minutes. Okay. And the microphone is not for amplification, just for recording, so keep your voices up so everybody can hear Good afternoon, Your Honors. Again, Tomás González on behalf of the appellant. May it please the Court, Counsel. The trial court heard in denying D'Entrelle-White's motion to suppress evidence where Officer Kasler did not have reasonable articulable suspicion of criminal activity to stop and frisk D'Entrelle as soon as he left the CTA platform. Officer Kasler admitted that before he stopped and frisked D'Entrelle, he did not see D'Entrelle commit any crimes. All he heard was someone yell a profanity from the top of the platform. Did the trial judge conclude that a crime was committed, the crime of assault was committed? But the officer never articulated that, and it's the state's I think the court concluded that on its own. The government never argued that at all? Did not. And Kasler certainly did not testify to that. All he testified was that he heard some profanities. He did not even know to whom it was directed. He didn't know who Also, did the officer testify that he simply spit it? Correct. Well, he said he, he spit over the platform in his direction, and he was 15 feet to the north. The platform was 20 feet up. And we don't know exactly how close it came to him, but what he did specifically say was that he was 15 feet to the north. The spit landed somewhere at least beyond the range where he did not feel threatened. And he didn't move? I'm sorry? And he did not move out of the way? Out of the way, yeah. No, correct. Which makes sense. Which makes sense of, you know, if someone's spitting at me from over there, I'm like, oh, that's nowhere near me, you know. Which I think explains why he said that. I just never felt threatened by it. And he said specifically So I don't want to put you on the spot, but how do you explain the trial court's finding that there was a crime in fact committed? And I'm not trying to put you on the spot. I'm not asking a legitimate question. No, I think that's a fair question. I honestly, other than just come and say, well, he must have, you know, spitting can be an assault, or he could have charged. But again, Kassar testified that, and he really has that very question. And he said he wasn't charged with anything in connection to Because if someone's standing 20 feet away from you and they say, I'll punch you. Absolutely. Absolutely. And I think, yeah, right. And assault being the reasonable apprehension, fear of a battery, well, that's all relative. Like you said, that example, that's a perfect example. I may not feel an apprehension or fear of a battery if someone's way over here. They're just starting to put me in that position. And Officer Pointblank said, Well, you're going to do that. But the question is what's the point? Well, I think, again, it's a question of whether or not the stop itself was legal. But as far as the facts and any factual findings that manifest way, and I agree with you, but the question becomes, well, how do we review the trial court's finding? The trial court made the finding that there was a crime. So did the trial court make a factual finding? I think that's what I find really disturbing about that, because the court just came right out and said and based this on something that there was absolutely no testimony to support that. I'm going to get back to your argument. I just wanted to get those things. Well, that was part of the point I was going to make anyway, because I think that's significant. And the court, particularly the last part of the findings, was essentially an end justifies the means. I mean, the court, there was a couple sentences quoted in the briefs, but where the officer said, well, I'm sorry, the court said, well, if he didn't have reasonable suspicion to stop him first then, well, then certainly by the time we got to the point where he's reaching into the pocket, then that certainly supported reasonable suspicion. And to me, that's just a garden variety, end justifies the means. Speaking of reaching into the pocket, are you familiar with Dickerson versus Minnesota? That's okay if you're not. Well, I mean, the name's familiar, but I get them all mixed up at this point. The case where you're reaching into the pocket, you find a bottle, a pill bottle, and it's clearly not a gun at that point. Yes. So is the officer allowed to continue pulling it out of the pocket? Or if he realizes it's not a gun, should he just let it go and keep patting it down and check the feet? Well, and since you bring that point up, I mean, that's another, I think that's a very well taken point, because once we get to the point of frisking, which is only supposed to be for the outer clothing, only after there's a reasonable fear of some kind of threat. So he can pull it outside the pocket if you feel a hard object. But the description that he pulled it out still after that, when it's, the idea that somehow the contours and feel of a standard orange prescription bottle, that it somehow isn't even close to that of a gun, you know, both in feel and contour. I mean, that's strange, credulity in and of itself. Was there any evidence that the size of the bottle actually missed that? No, other than the fact that it was a standard orange prescription bottle, which I think common sense, we all kind of know, should know. You know, it's just a standard bottle. Certainly doesn't resemble, again, both in size and feel and contours of a barrel of a gun. So even when we get to that point about whether or not we get to the padding of the outside clothing, particularly in this case a cold pocket, it just doesn't, it's just not believable that somehow it felt like the barrel of a gun. But again, before we even get to that point, I think much was made in the state's brief about, well, was this really a seizure? It's a way to occur. Was any part of this consensual? I don't think you disagree with the state that there was in fact a seizure. They admit there was a seizure when he told them to put his hands against the wall. Well, I submit that it actually took place before then. Okay. When do you think it took place? I think, okay, well, I think it basically took place once the officer, Kasler in particular, because he had his partners go to the west side and then he went to the east. They've already made a decision, well, I'm going to confront him when he comes out. You think that's a seizure, though? Oh, no. Okay. I just want to kind of set it up a little bit. So he decides to go in to the vestibule. So he goes inside of those and basically waits for him at the front door, essentially trapping him, trapping him. And that's under Jackson. It's the whole idea that the officers are basically controlling the movements right then and there. In other words, we're not going to let him get out. Well, we're going to block the entrance to the front door so that as soon as he comes down from the turnstile, as soon as he passes the turnstile, boom, we got him. And the officer said to him at that point, I mean, he was walking away. White was walking away from the officer, right? Well, this is what's a little, I guess, sometimes a little confusing or maybe not as clear. What he's doing is he's coming down from the platform. The officer has already set himself up and trapped him in the sense that he decided he's going to take his bike and he's going to wait for him inside the station. He goes inside the front door, basically standing by the front door, and then right between that and the vestibule with the idea that as soon as he comes down, I'm going to stop him. All right, so the only movement towards, quote, unquote, towards, I know the state makes much ado about this idea that he's coming towards the officer in some kind of menacing manner when he's just moving, he just happens to be moving towards the exit. And this is an officer who decided I'm going to plant myself there. I'm essentially going to trap him there, i.e. control his movement, which I think is a very significant show of authority. And what did he say, what did the officer say to him? Well, he said, get your hands out of the pocket. And so does an officer have a right to say that? Well, I guess it depends. I mean, what would give the, why could the officer even say that at that juncture? Well, I think he had no reason to. I mean, he wasn't coming at him, and D'Entreau wasn't coming at him in any kind of threatening manner. He was just leaving the platform. And he had his hands in his pockets in the middle of winter, which isn't all that. So he didn't take his hands out of the pocket, but as I understand, he kept moving? Well, he was just turning. While he was continuing to move, and the officer then told him to stop? Yeah, and told him to get his hands out of his pockets.   Well, I guess the officer was just trying to keep his hands out of his pockets. Yeah, but just getting his hands out, he didn't want him to keep. You take your hands out, continue walking? Yeah. All right. But he said he was just five to eight seconds. I get it all happened very quickly. And basically ordered him against the wall. Right. And then I think what's even more disturbing is, and I think whether the seizure occurs there or whether it occurs... Well, my question is, the seizure occurred before. I mean, did White have a legal basis to continue out the door? I'm sorry? Did White have a legal right to leave the vestibule? I think, yes, absolutely. Okay, and the State's saying that he didn't, right? I have to say he couldn't leave, that he was... No, I think the State... Well... No, I think they said in their group that he was free to leave. Well, yeah, but he wasn't free to leave in... Our position is that he wasn't. Right. Because of the show of authority, number one, by trapping him inside in the first place. And then number two, the tone of voice. How do we know the tone of voice? Well, I don't think it's a friendly request if... Well, but we don't know... The tone of voice is discussed in the briefs, and we don't have any recording of it, so we don't know... Now, that's true, but again, I think the fact that he trapped him in there, I think it's a pretty significant indicator that this wasn't going to be just some amicable, friendly, hey, can you please take your hands out of your pocket for me? That he was there to basically stop him. And when he didn't get the hands out of his pockets, it was just, you know, hands up against the wall. Right at that wall... By the way, it was still inside the front door. And he immediately... And I think the officer even testified that the fact that he wasn't getting his hands out of his pockets, even though there was no furtive movements, there was no erratic behavior, there was no charging the officer, anything like that... If an officer comes up to an individual on the street and says, take your hands out of your pocket, does the person stopped have to do that? Not if they're not doing anything... Well, I just gave you a scenario, just like here. He's coming down the stairs, got his hands in the pocket, officer goes up, take your hands out of your pocket. No, I don't think so. And if the person continues walking, what's going to happen in this city? If White had continued... Well, could he have continued? I don't think so, no. And I think that happened. Why do you say no? Well, because he didn't. Well, but he did. But he could have. I don't think he could have. Okay, why? Because he wasn't. He was basically ordered up against the wall. Because he was seated. But before he's ordered up against the wall, I mean, we know they say he sees that. Right. But you're saying he was seated once he was said, take your hands out of the pocket? Well, I think he was... And to the extent that the show of authority was there, and they had trapped him, they were there to intercept him. They were there to control his movements under Jackson. That's a very significant show of authority. But even if not at that point, then certainly by the point where he's up against the wall with his back to the officer, again, all before any criminality was witnessed, long before... The question, I think, that Justice Simons is getting to, at what point was he no longer free to leave? Because that's when the seizure begins. Was it when his hands was against the wall? Because it sounds like earlier you were saying as soon as the officers decided that they were going to stand on both sides of the exit. Well, I guess there's an alternate answer to that. I still maintain that he was never free to leave. And once the officer decided, I'm going to move in, and I'm going to block his path, and I'm not going to let him exit. But if not then, then certainly by the time he was... There was only one turnstile at this exit? Usually there's several of them. We weren't given a number. The only thing we do know from the records, the officer testified that once he got past the turnstile, he came down the stairs, he got past the turnstile, officers are waiting for him. And he immediately orders them to take his hands out of his pockets. And then when, I think he said he gave at least two demands. Within a span of five seconds, five to eight seconds, and then he's up against the wall. So this wasn't one of those instances where he has time to defy order, he has time to disperse or run somewhere, or they have to chase him down the block and then they catch up to him. Nothing like that. This was all within a matter of seconds. So I think, you know, whether it's when they surround him and they're there to intercept him or they actually physically had him against the wall, during which time officers... I mean, of course, somebody removed his hands. So he wasn't ready to commit one way or the other. He did at least acknowledge, I might have physically removed his hands from his pockets. So I think even if it's at that point, again, what we have that preceded that was no criminality, nothing that an officer articulated, which is their burden to articulate, no testimony about, again, furtive movements, erratic behavior, charging at the officer, nothing to the degree to which the state tries to portray in its brief. None of that took place. So I think that's the biggest problem here, both with what, in terms of the legality of the stop, and certainly when the court used, you know, kind of made its own conclusions to justify that somehow this other crime that was never articulated somehow may have occurred, and it just didn't. So you just answered my question that I started with, because I asked what you made of that, and I think you kind of... Okay, yeah. So you're saying that the court did not make a finding, the fact that the court made a conclusion. Yes. Okay. And maybe I danced around it a little more. I didn't answer it directly, but that is exactly my position. So I think... And I'll just state the same question. What weight do we give to that conclusion? None. Well, okay. Well, me too. The two of you said that it was... But there was no evidence to support it. There was no evidence to support the idea that... Well, we still have to, at the very least, ask ourselves, was it against the best weight of the evidence? Right, but there's no evidence. In other words, there was no evidence that the officer was in reasonable apprehension or fear of a battery, that he was assaulted. And I think that there's highly significant that he wasn't charged with anything in connection with that, either the vulgarity or the spitting. Right, but any time the court makes a finding, there's some standard placed on it. And basically, the minimum standard is whether or not that finding is against the manifesto. Well, no, so the deferential standard... At least that. The deferential standard, of course, right. But there's got to be, again, to the extent that there's just nothing, like this was certainly that, you know, it doesn't meet that standard, either. So getting, again, I do want to also address the manner that the state does take issue with, I guess... Okay, and your time's almost up. Oh, okay, well then, you know what, at one point I do want to finish up. Maybe I know my time's here. I just want to emphasize that Duntrell simply walking towards the station exit with his hands in his coat pockets in the middle of winter, and the fact that Cassler was standing by the exit to block him doesn't amount to a threat to Cassler. I mean, he basically, that's a threat of his own making, I guess, if you want to put it that way. And then exiting the station in this manner did not amount to reasonable suspicion by itself of criminal activity to justify the stop  And contrary to the state's position, no part of this encounter was consensual. So I would just say, to the extent so I don't run out of time, we already talked about the court's finding as far as, you know, we just addressed it here. So I would just conclude by saying that because Cassler had no reasonable suspicion to stop and frisk, the evidence in this case should have been suppressed. And because the evidence or the conviction cannot stand without this evidence that was illegally seized, his conviction should also be reversed. Thank you. Again, I'm Brad O'Connell, O-C-O-N-N-E-L-L, for the people of the State of Illinois. May it please the Court, Your Honors, Counsel. Defendant was seized at the moment that he was told to go up against the wall and place his hands against the wall. And at that moment, there were plenty of reasonable, articulable facts that indicated the criminal activity. What about earlier than that? He wasn't seized earlier than that? No, Your Honor. Both federal and state case law are abundantly clear that a seizure is not affected when an officer intends to affect one. It is affected when an individual concedes to that action, when an individual complies with police requests, police commands, however you'd like to characterize them. So even when and even if Officer Kasler's requests, get your hands out of your pockets, come talk to me, even if those were indeed police commands, it did not constitute a seizure until the moment that defendant complied. That happens in a number of cases. More restraints. So if a defendant, if the officer says, put your hands against the wall, the defendant runs, the defendant's not seized. Your Honor, I think if the defendant runs, the defendant is seized. So you're correct. It is either compliance or it is behavior consistent with trying to evade that compliance. Well, we're talking about a few seconds, right? Yes, Your Honor. And was there any hostile behavior from White? Yes, Your Honor. What was the hostile behavior? The hostile behavior started from the very beginning of the encounter when Officer Kasler and his fellow officers. There was no encounter, was there? The encounter occurred outside of the train station when Officer Kasler and his fellow officers were proceeding under the bridge, the train station. What is the behavior? The behavior is they heard hostile, volatile language. Oh, is that illegal? No, Your Honor, not in and of itself. Oh, why is it illegal? I can't, somebody can't swear with officers nearby? Your Honor, it's also not illegal to walk to and fro in front of a storefront with a friend and have conversations as occurred in Terry. It is not necessary for an officer to explicitly see criminal activity in order to justify reasonable suspicion. You have to have reasonable suspicion. Correct. He didn't even know who said those words. So how can you say that White was hostile? Doesn't even know. Testimony is he doesn't even know who said the words, correct? Correct. Your Honor, he did testify that he did not see who said the words. That is correct. Well, then you have to concede that he didn't know it was White. So where is the hostile behavior? The hostile behavior emerges when he infers who the language was directed to. Well, he inferred, I mean, that doesn't, it wasn't, it's Madame Crawford who said it, right? Your Honor. In the United States of America, somebody can swear, right? Your Honor, that is correct. However, an individual is directed to the police officer. They can think whatever they want, but there's no evidence it was directed to them. Your Honor, an individual is free to swear. However, officers are also welcome to interpret that activity as suspicious potential evidence of criminal activity. What criminal activity? The criminal activity that could have been occurring was, for example, assault or aggravated assault in the case of a police officer. But not when, I mean, if it's an assault on me, I should feel threatened, shouldn't I? Perhaps, Your Honor. However, that's not the standard for reasonable suspicion. It's the standard for assault, though. Correct, Your Honor, but defendant wasn't tried for assault. This isn't a beyond probable cause did assault occur. This is was there sufficient evidence, sufficient evidence, excuse me, of defendant's potentially criminal behavior, not explicitly criminal behavior. Potentially, what do you mean potential criminal behavior? All we have is somebody swore. It's not like we don't know that, right? We have no evidence explicitly of who swore, no, Your Honor. So you have to concede that. I would concede that we do not know 100%. I would, however, argue that Officer Kassler made clear in his testimony that he inferred it to be either defendant or defendant's friend. Well, of course. And then immediately following. And you saw. So we're talking about Mr. White. I think it is unnecessary to take each of these individual incidents in isolation. We're not taking them. I'm taking them one at a time. So let's take them one at a time. Very well. Your argument is. Yes, Your Honor. So for one, Mr. White did not say anything that we know of. Said those words that they first said, but we don't know who. Yes, Your Honor. Let's go one at a time. Let's take. So first I'm just taking hostile behavior. I don't see where the hostile behavior is. Defendant. Defendant. Somebody. Excuse me. Somebody shouted vulgarities, hostile vulgarities, in the direction of the police officers. Can I do that? I mean, I cannot. If the police officer is happily walking by, I can't say vulgarity? Your Honor, just because an action is legal does not mean it does not arouse suspicion. Usually, in fact. So it's suspicious to. . . You're saying as a matter of law, policemen can be suspicious when somebody swears in public. Yes, Your Honor. If it is compounded by additional circumstances.  If that's the law in Illinois, we are all in trouble. Because people swear all the time, and the police officers are all over the streets. And anybody that does that could be suspected of doing something wrong? That's your position. Your Honor, any of these incidences taken alone are not sufficient to satisfy reasonable suspicion under Terry. Well, but. . . However. . . Okay. However, each individual action compounded on top of the next, the swearing alone was weird, but maybe not necessarily criminal. He turns around. . . Not necessarily. Not criminal. Okay. Swearing is not criminal. Excuse me. However, when he then turns around and sees specifically defendant, locks eyes with defendant, Officer Gassler's testimony is that they were. . . He was staring at him. Oh, my God. And then. . . I can't stare at a police officer. I'm not a police officer. Is that illegal? You can stare at a police officer, yes, Your Honor. Oh, thank you. And I can stare at you. You cannot stare at a police officer, Your Honor. Where is this hostile? Staring at somebody. . . How is that. . . You need police officers to stop you because you look at them? Your Honor, the hostile behavior occurred ultimately when defendants sat at the police officers. Wait. They didn't testify they sat at them, did they? They testified that they sat in the direction of the police officers. Direction. Oh, yeah. But you said at. Now, there's a big difference between at and direction. The words in this brief that I know I'm not saying that your name is on the brief. It is, Your Honor. It is. Okay. There are various words used to describe the same incidents that may have very different meanings. And you're very loose with your wording, which I find very disturbing because sometimes you say at, sometimes you say towards, sometimes it's going one way, it's going the other way. It's very contradictory as to what you're saying in here. You just said at. Then you say it's direction. Well, if you spit over a platform and the officer doesn't even move, you have no idea. I mean, that's not a crime. That's not suspicious. Your Honor, I think it beggars belief that an individual who hears hostile vulgarities from immediately behind them turns around, whether they're a police officer or not, they hear hostile vulgarities behind them, they turn around and look towards the sound and they see an individual, they lock eyes with that individual, and that individual spits over the railing, maybe not directly at, but in the vicinity of, in the immediate proximity of that person. It wasn't immediate proximity. He didn't even have to move. We've gone through this. It was 15 to 20 feet away. And he's 20 feet high, 15 feet away. You seem to be taking all these facts to the extreme on a very simple situation. Your Honor, that's what the trial court found. The trial court found that all of these facts taken together suggested wrong. That's why we're here, okay? Correct. But the only way that we can make that finding if it is against the manifest weight of the evidence, the trial court does indeed have to be afforded that credibility or that deference in making that credibility determination in saying despite the fact that Officer Casler testified that he did not see directly criminal activity, there was nevertheless enough behavior testified to to support the possible conclusion of criminal activity. No, what is the criminal activity? The criminal activity is either assault or aggravated assault. And indeed, if we were going to prosecute those crimes, we could deal with those in court with a different set of finding facts. However, that is now what occurred here. But when did the assault take place? The assault took the attempted assault, if indeed it could have been that, and the trial court found that it was, took place the moment defendant sat in the direction of Officer Casler. Okay. I'm sorry. But in your brief, you say Casler testified that while defendant continued to ignore him as he asked him to approach and remove his hands from his pockets, he still had not seen him commit a crime. Yes, Your Honor. However, what Officer Casler sees is not necessarily, or rather what he attests to as considering a crime to him personally, is not the standard for reasonable suspicion. Officer Casler testified we decided not to charge him with a crime in that case. We decided not to, we did not see a crime. However, seeing a crime is not the standard for Terry. The officers didn't see a crime in Terry when they saw the two individuals facing the store. They were simply walking up and down the street. Reasonable suspicion. That's what we need to have. There was no reasonable suspicion of anything at that point. Your Honor, he had reasonable suspicion of hostile, aggressive behavior that could have been directed towards him. I'm not going to go through this. Okay? I'm not going to go through anything. But you keep saying that, and I don't think the facts don't back you up, but you can use those words. Your Honor, I just don't think that the alternative where a police officer hears these vulgarities, there is nobody else around. There's nothing wrong with vulgarities in this case. Yes, Your Honor, but there is a specific criminal statute that disallows the spitting towards, well, spitting at or spitting on other people. But he said there was no crime. I mean, you can't have it both ways. You can't have the officer testify no crime was committed. They weren't, he wasn't charged with it. Your Honor. He wasn't charged with it. So it's irrelevant. It's relevant for establishing reasonable suspicion, Your Honor. Reasonable suspicion is not the same standard as beyond a reasonable doubt in court. If, indeed, we were trying assault or aggravated assault for a defendant, that would be a different matter. Here, it doesn't need to be beyond a reasonable doubt. It doesn't even need to be a preponderance of the evidence. There needs to be something beyond a particular, an unparticularized hunch that criminal activity may have occurred. He didn't say a hunch. He didn't say he had suspicion. He said he specifically had suspicion. He said that he was concerned and wanted to find out what was going on. Now, that has nothing to do, I mean, what we're talking about is putting his hands in his pocket and taking out a file. Okay? That's what we're talking about. Okay. And he was, but you have somebody walking down, the officer says there's nothing wrong with the spitting. There's nothing wrong with the swearing. There's nothing wrong with the staring. And apparently, for you, that's troublesome. But thank God the police officer didn't say that. So I don't see how we should take that argument when the testimony isn't. Your Honor, he did not say there was nothing wrong with it. He said he did not see a crime. Well, but he has, the standard is reasonable, articulable suspicion of criminal activity. Yes, Your Honor. We all know that. But what the officer said, he wanted to see what was going on. Yes, Your Honor. That is not a reasonable, articulable suspicion of criminal activity. He wanted to see what was going on. Not at that moment, Your Honor. However, we don't need to have reasonable, articulable suspicion at that moment. It was compounded then after by defendant's refusal to comply. Comply with what? By defendant's refusal to take his hands off. Comply with what? Comply with coming to talk to the officer. I decided to talk to the officer. He doesn't, but it can still be interpreted as suspicious. Oh. So if I don't talk to an officer, it's suspicious. An officer can't construe it as such, yes. It is not. I'm talking about choice. You're saying that if an officer speaks to you, I can't walk away. Is that right? That is not what I said, Your Honor. I said that an officer. Let me ask you a question. Okay. Let me ask you a question. Let's try this. This way. Officer says to me, take your hands out of the pocket and I keep on walking. Can I do that? Yes, Your Honor. Then why did the officer continue to ask him to take his hands out of the pocket? Because he was investigating a suspicious situation. What was suspicious? There was an individual yelling profanities and spitting at people. That's not a crime. That's not. Spitting at people, specifically spitting at people is a crime, Your Honor. He wasn't spitting at anybody. Nobody said that they spit at somebody. It was direction. You said direction. You said direction. You also say at. You say towards. Taking. There is no specific testimony that says he was spitting at him. How could there be? He could not have possibly known defendant's state of mind. However, he can infer defendant's state of mind from the locking of the eyes and the spitting in his direction as he's walking. That's absolutely right. You can tell from a direction of how somebody spits. It was at somebody. You don't know when somebody spits at you? I mean, that can't be told. You can't tell from the circumstances? Your Honor, I don't. I think that given the circumstances, given all of these facts taken together, when you see, it wasn't just, oh, this person was. I saw this person sit there with a train platform. It was, I heard somebody shouting profanities, shouting hostile profanities. What do you mean hostile? The specific words used. How was it hostile? The specific words used were very pointed and very hostile. They're not going to say hostile. People say that. It's a swear. You say it's hostile. We don't know what tone it was. If we don't know the tone of the officer's voice. Your Honor, I don't think we need to. But you're talking hostile. But you're talking hostile. Your Honor, I think we can assume, given the inferences that the trial court made, that it was hostile language. I think. No, I don't think we can. I don't think we can. Your Honor, there was a finding of assault by the trial court in its pronouncement. They said it could have been assault. He wasn't charged with assault. He didn't have to be charged with assault. Just because the state's attorney doesn't charge somebody with a crime doesn't mean that evidence of criminal activity didn't occur. We're going in circles. I apologize. Your Honor, all of these circumstances taken together, the hearing of hostile profanities shouted from the train platform, the locking of eyes with defendant who then spits in the direction of the officers when nobody else is around, Officer Kasler specifically testified that he saw nobody else on the platform and that there was nobody else on the street. Excuse me. He testified that he wasn't sure how many people were on the platform, but they were the only two people at that spot. Then going to talk to him specifically to conduct a field interview. There were two other officers at the other entrance. Yes, Your Honor. Going to the entrances to try to conduct a field interview by Officer Kasler's own testimony, attempting to not arrest the defendant but investigate it, see what was going on. He doesn't have any right to do that. He has every right to do that, Your Honor. Why? Because any officer can conduct a field interview. Any officer can stop somebody. No, Your Honor. Any officer can conduct a field interview. Any officer can stop somebody. If the officer wants to conduct a field interview and the person decides that he or she does not want to speak with the officer, decides to walk away, at that point the officer can demand that they come back and talk to him. And at that point it becomes a reasonable suspicion inquiry. Just because they're walking away becomes reasonable suspicion of criminal activity. It can be the straw that breaks the camel's back, so to speak, but it cannot on its own be evidence of criminal activity. But it seems like they've been implying the whole time that the fact that the defendant did not want to speak with the officer, that creates a reasonable suspicion of criminal activity. Because you seem to be leaving some things out, and I think that Justice Griffith pointed out that it's that reasonable suspicion of criminal activity. Yes, Your Honor. It's not just you keep throwing it out there like reasonable suspicion, as if it's just reasonable suspicion of what? It's reasonable suspicion of criminal activity. Yes, Your Honor. And simply walking away doesn't get you to more than a hut that there's reasonable suspicion of criminal activity. You're correct, Your Honor. Since the walking away, taken alone with no other additional information, does not constitute reasonable suspicion of criminal activity. So that includes walking away with the comment that was made, which the officer said he didn't know if that was directed at him, the swearing, the foul language that was used. I don't use foul language, so I'm not going to say that here. But here, Your Honor. And then you have the spitting, which the officer said he was 20 feet up. The officer was 15 feet away from the area where the spit may have landed. So you're even taking all of that together. And I think we all agree that these things are about the totality of the circumstances. I don't think any of the Justices here necessarily agree with you. But when you take the totality of the circumstances, even if you look at each individual situation, it just — and you combine them, it's not quite getting us there. That's what we're asking for your help with. How does it get us there? So take a minute and tell us. Of course. So it is our position that we had achieved sufficient specific articulable facts to satisfy the reasonable suspicion of criminal activity standard at the moment defendant sat over the railing. That, given the information available to the officer, could have, not necessarily did writ large, but could have constituted criminal activity under the ASTOL statute. So did you actually agree with defense counsel then that there was a — that the Terry stop started as soon as he came down from the platform? No, Your Honor. Because at that point, Officer Casler testified he did not intend to stop. He intended to conduct a field interview. But you said the spinning gave him reasonable articulable belief that a crime was at foot. Yes, Your Honor. And an individual, a police officer, can exercise discretion in deciding whether they want to escalate an encounter with a civilian or not. They can in that instance — they could have in that instance said, all right, this person, there's criminal activity sufficient to, for example, arrest for assault. Let's go into that. Or they could say, this is a little weird. I don't like where this is going. Let's just go talk to you. I know I implied that I asked whether or not there was a Terry stop, which is not the same as a seizure. Correct, Your Honor. So — but you don't even believe that the officer was engaged in a Terry stop. You believe that at the point that Casler says that the defendant was seized, you believe that was just a consensual encounter. Your Honor, I think Officer Casler testified to his intent. I think the only evidence that we have as to the character of the encounter at that point, before defendant tried to exit with his hands in his pockets, was that it was a field interview. A consensual encounter, and that therefore — Well, at least that Casler — Your Honor, the officer did not believe that a crime had occurred, either with the foul language or the spit. Well, Your Honor, that he chose not to view it as such. It is entirely within the realm of possibility that the officer could have seen this activity. And in fact, the testimony that he gave suggests that he had this thought. He said he did not charge — they did not charge him with a crime of assault. They did not. Your Honor, Justice has commented earlier, too, that in order for it to be an assault, I have to be threatened. If someone is assaulting me, I have to be threatened by them. Yes, Your Honor. And even that needs to be reasonable if you're going to — and Counsel mentioned if you're going to — if you say you're going to punch someone and you're standing 20 feet away, well, it's kind of hard to — I mean, you've got to start at least walking towards me for me to — for it to become an assault, right? And for that reason, even if it wasn't directed towards an officer, even if it wasn't at Kassler, there is still enough evidence to suggest that criminal activity amounting to assault was occurring. That's why it's reasonable suspicion. Based on what? Based on the spitting, because we don't know that this is the first time he's spat at — or rather, Officer Kassler doesn't know that. He sees an individual spitting over a train platform. For all he knows, he's been spitting for the last two hours. He sees an individual who — maybe he thinks it's a game. Maybe — there's all sorts of speculation that could have occurred in Officer Kassler's mind at the time. But he sees behavior consistent with criminal activity. He was a minor, correct? Yes, Your Honor. Okay. And that's why he did not seek to arrest him right at that moment. He went to conduct a field interview by his own testimony. When he approaches and says, hey, get your hands out of your pockets, defendant refuses to comply. Asks again. Defendant refuses to comply and continues on his way, which is his legal right. However, just because defendant has a legal right to continue on his way does not necessarily mean that the officer can't interpret that, given all of the other things that have occurred, as evidence of criminal activity. All of those circumstances take — How many cases do you say there are? Under Terry, Your Honor. Under Terry, there is — under Terry and its progeny, it is clear that just because something is legal does not mean it's not suspicious. But just because somebody walks away from a police officer — you have — a police officer doesn't have a right to stop you for no reason. No, Your Honor. If you don't want to speak to a police officer, you can walk away. That is your right, Your Honor. Apparently, you're saying it's not because he had to stop. In fact, he couldn't get out of the rest of you, right? Your Honor, he was free to go on his way. However, until the moment — How did he do that? He was free to go on his way until the moment he told him to get his hands up against the wall. And at that point, there was a — He wasn't free. All of this took a few seconds. But he couldn't get out, right? I — there's no testimony to suggest that the answer was stopped. Police officer, you just put your hands against the wall. Yes, Your Honor. That's an escalation by the police officer. Yes, Your Honor. At that point, there was a seizure. We believe that the totality of the circumstances suggest that there was criminal activity at foot at the moment that defendant stabbed over the railing and that a seizure — when the seizure occurred at the moment Officer Kassler asked him to put his hands up against the wall, that reasonable articulable suspicion was sufficient to satisfy the standard necessary under Terry. For that reason, we ask that you affirm the lower court's decision. Thank you, Your Honors. Thanks. Just a couple of really quick points. Again, this was talking about the assault. I mean, because that is situational. That is directed at someone. And it is a matter of degree. You know, if I'm sitting way over here, that's not putting anybody immediately around me in any kind of apprehension of receiving a bat or anything like that. So it is significant, the fact that the officer didn't articulate, which, again, it's the state's burden. It's the officer's burden to articulate specifics, specific criminality. That clearly wasn't done here. But her argument is that you just don't look at that one. You have to look at all the things that happened before. And, granted, that's the case. But, again, when you have zero plus zero plus zero still equals zero. I mean, none of this amounts to any articulable criminality. It's just essentially what it boils down to is White walking down, walking past the turnstile, making his way towards the exit with his hands in his pocket, middle winner. And it's significant that the officers from the very get-go basically go inside to trap him, to trap him. He was basically surrounded. He wasn't going to leave that. So he was never free to leave from the very beginning. I think that's highly significant. That's a significant show of authority. And barring any other questions, that's the main thing I wanted to highlight. Okay, great. Thanks. Thanks again, folks. We really appreciate your work. We appreciate your briefs. And we'll be here from a certain point.